UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LESHANDA C.[1],
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:20-cv-738
Litkovitz, M.J.

ORDER

Plaintiff Leshanda C. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for supplemental security income ("SSI"). This matter is before the Court on plaintiff's Statement of Errors (Doc. 18), the Commissioner's response in opposition (Doc. 19), and plaintiff's Reply (Doc. 21).

## I. Procedural Background

Plaintiff protectively filed her application for SSI in July 2017, alleging disability since January 13, 2017, due to schizophrenia; bi-polar disorder; and chronic idiopathic urticaria. The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Renita K. Bivins. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing on August 22, 2019. On October 24, 2019, the ALJ issued a decision denying plaintiff's SSI application. This decision became the final decision of the Commissioner when the Appeals Council denied review on June 11, 2020.

---

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920 (b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since July 7, 2017, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The [plaintiff] has the following severe impairments: chronic idiopathic urticarial, schizoaffective disorder, and bipolar depression disorder (20 CFR 416.920(c)).
>
> 3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the [plaintiff] must avoid concentrated exposure to dust, gases and poorly ventilated areas. She can engage in interaction with public and coworkers on a superficial basis meaning that the job does not require customer service duties, conflict resolution, or persuading others. She can interact with supervisors occasionally or no more than one third of the workday. She can adapt adequately to infrequent changes and changes can be explained. She is able to remain on task 96% of the work period.
>
> 5. The [plaintiff] is capable of performing past relevant work as a construction worker. This work does not require the performance of work-related activities precluded by the [plaintiff]'s residual functional capacity (20 CFR 416.965).[2]
>
> 6. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since July 7, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 20-38).

---

[2] Relying on the VE's testimony, the ALJ made an alternative Step Five finding and found that plaintiff would be able to perform the requirements of representative medium, unskilled occupations such as warehouse worker (200,000 jobs in the national economy), industrial cleaner (180,000 jobs in the national economy), and laundry worker (79,000 jobs in the national economy). (Tr. 36-37, 70).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

**D. Specific Errors**

On appeal, plaintiff alleges a single assignment of error: that the "ALJ's mental RFC determination is unsupported by substantial evidence as [s]he [the ALJ] failed to properly evaluate the opinion evidence of record, instead relying on h[er] mischaracterizations of the

4

record." (Doc. 18 at PAGEID 2255).[3] Specifically, plaintiff argues that "the ALJ failed to properly address the opinion of Dr. Stevenson" by mischaracterizing the evidence of record, failing to accurately consider plaintiff's reports of fatigue, and failing to provide citations to any evidence that would support the ALJ's highly specified RFC limitations. (*Id*. at PAGEID 2263).[4]

The Commissioner argues that the ALJ's RFC is substantially supported by the record, and the ALJ's evaluation of Dr. Stevenson's opinion is supported by substantial evidence "given its inconsistencies with other objective evidence." (Doc. 19 at PAGEID 2276, citing Tr. 33-34).

### a. Relevant medical record

Prior to the alleged onset date of January 13, 2017, plaintiff was diagnosed with urticaria. (*See* Tr. 428, 542, 573-74). On January 15, 2017, plaintiff presented to the emergency department with a chief complaint of rashes on her arms, legs, back, and buttocks. (Tr. 354). Plaintiff reported "fighting this intermittently for the last 6 months." (*Id*.). Plaintiff had no difficulty with breathing, swallowing, chest pain, or shortness of breath. (*Id*.; *see also* Tr. 356). On examination, hives were noted on plaintiff's entire body sparing the face. (Tr. 356). Plaintiff was discharged the same day in stable condition and placed on a short course of steroids and Atarax. (*Id*.). Plaintiff was encouraged to follow up with dermatology. (*Id*.). Plaintiff again presented to the emergency department with complaints of hives on February 17, 2017. (Tr.

---

[3] Although plaintiff alleges that the ALJ erred on the basis of the "mental RFC determination," plaintiff's Statement of Errors solely concerns the ALJ's evaluation of the opinion of Dr. Stevenson, who assessed limitations based on plaintiff's chronic idiopathic urticaria. (*See* Doc. 18 at PAGEID 2263-68; *see also* Doc. 19 at PAGEID 2271 n. 2). Accordingly, as plaintiff does not argue that the ALJ erred in evaluating her schizoaffective disorder and bipolar depressive disorder, plaintiff has waived any challenges regarding these impairments. *See Watts v. Comm'r of Soc. Sec.*, No. 1:16-cv-319, 2017 WL 430733, at *11 (S.D. Ohio Jan. 31, 2017), *report and recommendation adopted*, 2017 WL 680538 (S.D. Ohio Feb. 21, 2017) (argument waived where plaintiff did not "develop it legally or factually in the Statement of Errors").

[4] The Court notes that plaintiff alleges no error in the ALJ's weighing of the other various medical opinions in the record.

5

367). She was discharged the same day in stable condition with prescriptions for Decadron, Pepcid, and Atarax. (Tr. 368). The etiology of plaintiff's urticaria was unknown. (*Id*.).

On March 17, 2017, plaintiff presented to the emergency department with hives. (Tr. 379). On examination, plaintiff was well-developed, well-nourished, alert and oriented, and appeared to be in no acute distress. (Tr. 380). Plaintiff's urticaria was observed throughout her body with no concern for secondary infection. (*Id*.). The emergency room physicians "discussed the possibility of [plaintiff's urticaria] being stress induced." (*Id*.). Plaintiff was discharged in improved and stable condition the same day she arrived and was started on a five-day course of prednisone and Zyrtec and Atarax as needed. (Tr. 381).

On April 20, 2017, plaintiff started treatment with Dr. Margo Stevenson. (Tr. 693). Plaintiff reported that she had been to the emergency room numerous times for hives and recently started taking NSAIDs (Non-steroidal anti-inflammatory drugs) on a near daily basis. (*Id*). On physical examination, Dr. Stevenson reported that plaintiff was well-appearing and in no distress with clear lungs; and she had few hives on the stomach and feet. (*Id*.; *see also* Tr. 696). Dr. Stevenson diagnosed plaintiff with chronic idiopathic urticaria/angioedema – possibly exacerbated by NSAID use. (*Id*.). Dr. Stevenson increased plaintiff's medications and added Singulair. (Tr. 699).

On May 6, 2017, plaintiff presented to the emergency room with chronic urticaria. (Tr. 392). Plaintiff denied experiencing any pain but reported intense pruritis. (*Id*.). Plaintiff was discharged the same day in stable condition. (Tr. 393). Three days later, on May 9, 2017, plaintiff presented to the emergency room with complaints of hives. (Tr. 403). Plaintiff requested a steroid shot. She denied shortness of breath and facial swelling. (*Id*.). On

examination, multiple hives were observed on the chest and abdomen. (Tr. 404). Plaintiff was discharged the same day in stable condition and given Depo-Medrol and Benadryl. (*Id.*).

Plaintiff had a follow-up appointment with Dr. Stevenson on May 11, 2017, where plaintiff reported that she had gone to the emergency department twice in the past week because of urticaria. (Tr. 711-12). On examination, plaintiff had hives on her forearms, wrists, inner knee, and thighs bilaterally with no cyanosis or clubbing. (Tr. 714). Plaintiff was advised to avoid NSAID use, including Tylenol for pain, as this may exacerbate her urticaria. (Tr. 716). Dr. Stevenson ordered plaintiff to be given Xolair 300 mg injections. (Tr. 717).

On June 2, 2017, plaintiff started receiving Xolair injections monthly. (Tr. 758; *see* Tr. 475). On July 13, 2017, Dr. Stevenson reported that plaintiff's urticaria and itching had "significantly improved with the Xolair." (Tr. 758). Dr. Stevenson stated that plaintiff did not have itching or urticaria for three weeks following the Xolair injections and only experienced itching in the fourth week with urticaria near the end of the week. The urticaria was more mild than previous with discrete dime-sized scattered hives. Dr. Stevenson stated that plaintiff experienced worsening fatigue, new onset diarrhea, and post-injection hives that plaintiff believed was related to the Xolair. (Tr. 758-59). Plaintiff, however, indicated that the hives resolved the following morning after she took 25 mg of prednisone. (Tr. 759). On examination, plaintiff had no hives, cyanosis, or clubbing. (Tr. 761). Dr. Stevenson continued plaintiff's medications and adjusted the Xolair injections to help with post injections hives and itching. (Tr. 761-62).

On this date, Dr. Stevenson completed an assessment form on behalf of plaintiff. (Tr. 772-73). Dr. Stevenson listed plaintiff's diagnosis as chronic idiopathic urticaria and indicated that plaintiff's symptoms associated with her impairments would "often" be severe enough to

7

interfere with the attention and concentration required to perform simple work-related tasks. (Tr. 772). Dr. Stevenson stated that plaintiff would experience drowsiness because of the antihistamines required to treat her chronic urticaria. (*Id*.). Dr. Stevenson opined that plaintiff would not need to recline or lie down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon. (*Id*.). Dr. Stevenson also opined that plaintiff could sit and stand/walk 8 hours in an 8-hour workday. (*Id*.). Dr. Stevenson stated that plaintiff would need to take an unscheduled 15-minute break every 3 to 4 hours for medications during an 8-hour workday. (*Id*.). Dr. Stevenson opined that plaintiff would likely be absent from work as a result of her impairments or treatments three to four times a month because plaintiff would need "monthly infusions of Xolair." (Tr. 773).

Following the July 13, 2017 appointment with Dr. Stevenson, plaintiff received Xolair injections every four weeks through April 2018. No signs or symptoms of reaction were noted for two hours following the Xolair injections. (Tr. 1765, July 13, 2017; Tr. 1772, August 31, 2017; Tr. 1780, September 28, 2017—plaintiff screamed loudly while injections were given; Tr. 1788, November 2, 2017; Tr. 1796, November 30, 2017; Tr. 1804, December 28, 2017; Tr. 1812, January 25, 2018; Tr. 1833, February 26, 2018; Tr. 1841, March 26, 2018).

On April 23, 2018, plaintiff presented for her Xolair injection and stated that the injection relief is not lasting to the four-week mark. Plaintiff stated that she had burning in the bottom of her feet for the last week. She presented with small, raised welts on the bilateral forearms. Plaintiff received her Xolair injection with no signs or symptoms of reaction. (Tr. 1849). On May 21, 2018, plaintiff received a half-dose of the Xolair injection with no complications. (Tr. 1869). Plaintiff was scheduled to return in two weeks for the next Xolair injection. (*Id*.).

Plaintiff saw Dr. Stevenson on May 24, 2018 for a follow-up appointment. (Tr. 1877-81). Plaintiff reported having hives at night about four nights per week. (Tr. 1877). Plaintiff believed that the Xolair injections were only suppressing the hives and not making them go away. (*Id.*). Plaintiff told Dr. Stevenson that the hives eventually covered 100% of her body over an eight-hour time frame and lasted 1.5 hours before clearing up after she took medication in the morning. (*Id.*). Dr. Stevenson reported that the frequency of the urticaria had lessened and plaintiff improved with the Xolair injections. (Tr. 1878). Dr. Stevenson observed no hives during the physical examination with only some redness present. (Tr. 1880). Dr. Stevenson indicated that plaintiff experienced post injection hives that were relieved by self-administered prednisone. (Tr. 1881). Dr. Stevenson stated that plaintiff switched to Xolair injections every two weeks to potentially reduce post injection reaction and to stop the breakthrough itching in the final week before the next dose. (*Id.*).

Thereafter, plaintiff received Xolair injections every two weeks through December 4, 2018. Plaintiff reported that she was doing well and tolerated the Xolair injections with no side effects or reactions. (Tr. 1895, June 4, 2018; Tr. 1902, June 18, 2018; Tr. 1909, July 2, 2018; Tr. 1931, July 16, 2018; Tr. 1946-47, July 30, 2018; Tr. 1955, August 13, 2018; Tr. 1962-63, August 27, 2018; Tr. 1989-90, September 10, 2018; Tr. 2009-10, September 24, 2018; Tr. 2029, October 23, 2018; Tr. 2036-37, November 6, 2018; Tr. 2044, November 20, 2018; Tr. 2051, December 4, 2018; Tr. 2057-58, December 18, 2018).

Plaintiff saw Dr. David Bernstein for a follow-up appointment on August 30, 2018. (Tr. 1971). Plaintiff reported that the Xolair injections controlled her urticaria 85% of the time. (*Id.*). Plaintiff stated that her hives itched at night but seemed to resolve by the morning. (*Id.*). Plaintiff denied significant side effects from Xolair with the exception of diarrhea two days prior

to her next infusion. (*Id.*). On examination, Dr. Bernstein stated that plaintiff was well-developed, well-nourished, in no acute distress, and alert and oriented; and she had no rashes, ulcerations, or petechiae on her skin but sporadic healed excoriation scars on arms bilaterally. (Tr. 1973).

On September 20, 2018, plaintiff presented to Drs. Kristen Schmidlin and Ilona Dubuske for a follow-up appointment related to her urticaria. (Tr. 1998-2002). Plaintiff reported her hives were doing "ok" but her skin tingled and itched a few days before her next Xolair injection. (Tr. 1999). Plaintiff did not want to change her medication regime. (*Id.*; *see also* Tr. 2000). On examination, plaintiff was well-appearing in no distress and had no hives with few scattered excoriations on the wrist and arms. (*Id.*; *see also* Tr. 2001).

On plaintiff's September 27, 2018 follow-up appointment with Dr. Dubuske, plaintiff reported her hives were "much better." (Tr. 2018). Plaintiff stated "her hives [were] much better with this regimen as compared to once a month." (Tr. 2019). Plaintiff indicated that she was "overall very pleased with how Xolair [was] working" and she did not want "to add any further therapy to her regimen." (*Id.*).

On December 18, 2018, during plaintiff's Xolair injection, plaintiff stated she needed Xolair "more frequently." (Tr. 2057). Plaintiff was monitored for 30 minutes post injection with no signs or symptoms of reaction noted. (Tr. 2058). Likewise, on January 3, 2019, during her Xolair injection, plaintiff stated she "wishe[d] she could get Xolair sooner" because it did "not last until the next injection." (Tr. 2071). Plaintiff was monitored for 30 minutes post injection and no signs or symptoms of reaction were noted. (*Id.*). Despite these concerns, from January 17, 2019 to March 14, 2019, plaintiff received her Xolair injections with no complaints, and no post injection side effects or reactions were noted. (Tr. 2079, January 17, 2019; Tr. 2085-86,

January 31, 2019; Tr. 2093, February 14, 2019; Tr. 1644, February 28, 2019; Tr. 1660, March 14, 2019).

On a March 28, 2019 follow-up appointment with Dr. Dubuske, plaintiff reported that she continued "to have hives but to a lesser degree." (Tr. 1677). Plaintiff stated that she had hives every other week which covered most of her body and interfered with her quality of life. (*Id*.). Dr. Dubuske reported that plaintiff had tolerated "Xolair well without any large local reactions or adverse events." (*Id*.). Plaintiff declined Dr. Dubuske's option of adding Cyclosporine to her regime for hive management because plaintiff was not "interested in adding any new medications." (*Id*.). On examination, plaintiff was well-developed, well-nourished, in no acute distress, and alert and oriented; she had no cyanosis, clubbing, or edema; and she had no rashes, ulcerations, or petechiae. (Tr. 1679-80; *see also* Tr. 1681). Dr. Dubuske found plaintiff's "hives [were] well controlled." (Tr. 1680).

Plaintiff presented to the emergency department on March 28, 2019 because she felt "like she [was] about to develop hives on her feet." (Tr. 1713). Plaintiff had mild shortness of breath with exertion without wheezing, paresthesias, and mild swelling of her feet. (*Id*.). On examination, plaintiff was well-nourished, well-developed, and in no apparent distress; she had no focal swelling or tenderness and no peripheral edema; her skin was warm and well perfused without rashes or lesions; she had no hives, no lesions on the palms or soles of her feet, and no erythema; and no warmth or swelling was observed. (Tr. 1715-16; *see also* Tr. 1717). Plaintiff was given a Xolair injection and discharged in stable and improved condition. (Tr. 1717).

Following plaintiff's March 28, 2019 emergency department visit, from April 11, 2019 through the rest of the medical record, plaintiff continued to receive Xolair injections every two

11

weeks with no difficulties or side effects following the injections. (Tr. 2128-29, April 11, 2019; Tr. 2156-57, April 25, 2019, May 9, 2019, May 23, 2019, June 6, 2019, and June 20, 2019).

### b. The ALJ's evaluation of Dr. Stevenson's July 13, 2017 opinion

The ALJ found Dr. Stevenson's opinion to have "limited persuasiveness." (Tr. 34). The ALJ explained that the opinion "was given when the claimant first started her treatment of Xolair; her first injection was in June of 2017." (*Id*.). The ALJ found that the medical record did not support "the extreme degree of absenteeism opined and especially considering that the claimant subsequently reported that most of her symptoms occur at night but in the morning the hives resolved." (*Id*.). The ALJ stated:

> She [plaintiff] also reported she had less hives than previously and she took prednisone twice a week that resolved her hives. (Exhibit B20F/211). The records repeatedly noted no reported side effects to [the] Xolair injection[s], no observations of reactions after observing the claimant for the required period of 30 minutes, and she tolerated the injection[s] without difficulties or side effects. (Exhibit B20F/4, 5, 12, 36, 44, 52, 73, 81, 89, 135, 142, 149, 171, 186, 187, 229, 230, 249, 276, 284, 291, 298, 311, 319, 325, 333, B21F/23, 24). The record also often noted that claimant presented for injections reporting that she was feeling well, doing fine, or feeling fine. (Exhibit B20F/135, 195, 202, 239, 319, 325, B21F/23, 24). The undersigned [ALJ] also takes into consideration that Dr. Stevenson found the claimant had no limitations with standing, sitting, or walking.

(*Id*.).

### c. Evaluating medical opinions

For claims filed on or after March 27, 2017, new regulations apply for evaluating medical opinions. *See* 20 C.F.R. § 416.920c (2017); *see also* 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). These new regulations eliminate the "treating physician rule" and deference to treating source opinions, including the "good reasons" requirement for the weight afforded to

12

such opinions.[5] *Id*. The Commissioner will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[6], including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner will consider "how persuasive" the medical opinion is. 20 C.F.R. § 416.920c(b).

In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship, (4) specialization, and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The most important factors the ALJ must consider are supportability and consistency. 20 C.F.R. § 416.920c(b)(2). With respect to the supportability factor, "[t]he more relevant the objective medical evidence[7] and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). Similarly, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s). . . ." 20 C.F.R. § 416.920c(c)(2). The ALJ is required to "*explain* how [he/she] considered the supportability and

---

[5] For claims filed prior to March 27, 2017, a treating source's medical opinion on the issue of the nature and severity of an impairment is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "The Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(2)).

[6] A "prior administrative medical finding" is defined as "[a] finding, other than the ultimate determination about whether the individual is disabled, about a medical issue made by an MC [medical consultant] or PC [psychological consultant] at a prior administrative level in the current claim." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850. For clarity, the Court will refer to the limitations opined by the state agency reviewing physicians and psychologists as "assessments" or "opinions."

[7] Objective medical evidence is defined as "signs, laboratory findings, or both." 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5850.

consistency factors for a medical source's medical opinions" in the written decision. 20 C.F.R. § 416.920c(b)(2) (emphasis added). Conversely, the ALJ "may, but [is] not required to, explain" how he/she considered the relationship, specialization, and other factors set forth in paragraphs (c)(3) through (c)(5) of the regulation. *Id.* However, where two or more medical opinions or prior administrative findings about the same issue are equally persuasive, the ALJ must articulate how he or she "considered the other most persuasive factors in paragraphs (c)(3) through (c)(5). . . ." 20 C.F.R. § 416.920c(b)(3). Finally, the ALJ is not required to articulate how he or she considered evidence from nonmedical sources. 20 C.F.R. § 416.920c(d).

### d. The ALJ properly evaluated the opinion of Dr. Stevenson.

Plaintiff argues that the ALJ's RFC is unsupported by substantial evidence because the ALJ failed to properly evaluate the opinion of Dr. Stevenson. (Doc. 18 at PAGEID 2263). Plaintiff provides three reasons why she believes the ALJ failed to properly evaluate Dr. Stevenson's opinion: the ALJ (1) mischaracterized the evidence of record; (2) failed to accurately consider plaintiff's reports of fatigue; and (3) failed to provide citations to any evidence that would support the ALJ's highly specified RFC limitations. (*Id.*). The Court finds the ALJ properly evaluated Dr. Stevenson's opinion, and the ALJ's RFC is supported by substantial evidence.

Plaintiff fails to discuss how the ALJ erred in evaluating Dr. Stevenson's opinion pursuant to the new regulations. Rather, the ALJ reasonably found that Dr. Stevenson's opinion had limited persuasiveness as it was not well supported and inconsistent with the evidence of record. (Tr. 34). In particular, the ALJ discussed how Dr. Stevenson's opinion that plaintiff would likely be absent from work as a result of her impairments three to four times a month was rendered only one month after plaintiff began her Xolair treatment and was inconsistent with the

14

record. The ALJ explained that subsequent medical evidence revealed that plaintiff's "injections did not take up a whole day" and plaintiff would stay "for two hours . . . sometimes only 30 minutes" after an injection to see if there was a reaction. (*Id*.). Citing to the individual notes documenting plaintiff's Xolair injections, the ALJ stated the physicians "repeatedly noted no reported side effects" and there were "no observations of reactions" following the Xolair injections. (*Id*.). The ALJ also noted that Dr. Stevenson's "degree of absenteeism opined" was inconsistent with plaintiff's reports that "most of her symptoms occur[ed] at night" and the hives resolved in the morning. (*Id*.). The ALJ's evaluation of Dr. Stevenson's opinion is substantially supported by the record.

Plaintiff argues that the ALJ improperly evaluated the opinion of Dr. Stevenson by "failing to take into consideration the full extent of Plaintiff's treatment." (Doc. 18 at PAGEID 2264). Citing to a single treatment note, plaintiff first argues that the ALJ did not take into account plaintiff's reports that the Xolair injections "would cause fatigue." (*Id*., citing Tr. 758). The ALJ, however, expressly took into account plaintiff's subjective symptoms of fatigue by stating that the RFC "accommodates the claimant's chronic idiopathic urticaria, *along with her subjective symptoms of fatigue* and itching by limiting the claimant to the medium exertional level. In addition, as a precaution as it was still unclear why the claimant was getting hives and rashes, she should avoid concentrated exposure to dusts, gases, and poorly ventilated areas." (Tr. 30) (emphasis added). Moreover, although plaintiff reported a single instance of worsening fatigue (Tr. 758, July 13, 2017), no subsequent treatment notes in the record document this symptom of fatigue. The ALJ comprehensively discussed each and every treatment note in this regard. (Tr. 27-29). Specifically, Dr. Stevenson repeatedly reported that the frequency of the urticaria had lessened and plaintiff improved with the Xolair injections. (Tr. 1878). Moreover,

15

plaintiff reported that she was doing well and tolerated the Xolair injections with no side effects or reactions. Specifically, on August 30, 2018, plaintiff denied significant side effects from Xolair with the exception of diarrhea two days prior to her next infusion. (Tr. 1971). Moreover, on plaintiff's September 27, 2018 follow-up appointment with Dr. Dubuske, plaintiff reported that she was "overall very pleased with how Xolair [was] working" and she did not want "to add any further therapy to her regimen." (Tr. 2019). Plaintiff reported no symptoms of fatigue other than the single instance on a July 13, 2017 appointment with Dr. Stevenson. Accordingly, the ALJ did not err by failing to take into account plaintiff's reports of fatigue.

Plaintiff also argues that the ALJ's conclusion that plaintiff "was repeatedly observed to not have any difficulties or side effects" is "not an accurate reflection of the record." (Doc. 18 at PAGEID 2265, citing Tr. 34). Plaintiff contends that "the actual record showed Plaintiff was repeatedly observed to not have any *allergic* reaction the infusion, not that she did not have any side effects." (*Id.*) (emphasis in original). As best the Court can discern, plaintiff therefore contends that the ALJ erred by construing that plaintiff had no effects from the Xolair injections from notations of a lack of a reaction. (*Id.*). Plaintiff's argument is unsupported by the record.

The record reveals, and the ALJ correctly concluded, that there were "no reported side effects to [the] Xolair injection[s], no observations of reactions after observing the claimant for the required period of 30 minutes, and she tolerated the injection[s] without difficulties or side effects." (Tr. 34). Plaintiff does not point to a single instance in the record where plaintiff experienced side effects or a reaction from the Xolair injections.[8] Other than a single instance on September 28, 2017 where plaintiff "[s]creamed loudly" while she received the Xolair injection

---

[8] The Court notes that to the extent that plaintiff experienced post injection hives, the record demonstrates that the hives were relieved by self-administered prednisone. (Tr. 1881). Moreover, the evidence shows Dr. Stevenson switched the frequency of the Xolair injections from monthly to bi-weekly to potentially reduce post injection reaction and to stop the breakthrough itching in the final week before the next Xolair dose. (*Id.*).

16

(Tr. 1780), the record demonstrates that plaintiff suffered no side effects or reactions following her Xolair injections. (*See* Tr. 1788, November 2, 2017; Tr. 1796, November 30, 2017; Tr. 1804, December 28, 2017; Tr. 1812, January 25, 2018; Tr. 1833, February 26, 2018; Tr. 1841, March 26, 2018; Tr. 1849, April 23, 2018; Tr. 1869, May 21, 2018, Tr. 1895, June 4, 2018; Tr. 1902, June 18, 2018; Tr. 1909, July 2, 2018; Tr. 1931, July 16, 2018; Tr. 1946-47, July 30, 2018; Tr. 1955, August 13, 2018; Tr. 1962-63, August 27, 2018; Tr. 1989-90, September 10, 2018; Tr. 2009-10, September 24, 2018; Tr. 2029, October 23, 2018; Tr. 2036-37, November 6, 2018; Tr. 2044, November 20, 2018; Tr. 2051, December 4, 2018; Tr. 2057-58, December 18, 2018; Tr. 2071, January 3, 2019; Tr. 2079, January 17, 2019; Tr. 2085-86, January 31, 2019; Tr. 2093, February 14, 2019; Tr. 1644, February 28, 2019; Tr. 1660, March 14, 2019; Tr. 2128-29, April 11, 2019; Tr. 2156-57, April 25, 2019, May 9, 2019, May 23, 2019, June 6, 2019, and June 20, 2019).

Plaintiff's contention that the ALJ erred by determining that plaintiff was repeatedly observed to not have any difficulties or side effects from the Xolair injections is belied by the record. Accordingly, the ALJ's determination that plaintiff was not observed to have any difficulties or side effects from the Xolair injections is supported by substantial evidence.

Plaintiff next argues that the ALJ erred by failing to address Dr. Stevenson's opinion that plaintiff's symptoms were often severe enough to interfere with her ability to attend and concentrate to the extent required to perform simple work-related tasks. (Doc. 18 at PAGEID 2266). Contrary to plaintiff's argument, the ALJ did not fail to discuss this portion of Dr. Stevenson's opinion. Rather, the ALJ thoroughly examined the record evidence and reasonably concluded that plaintiff's symptoms were not as severe as Dr. Stevenson opined. (Tr. 27-30, 32-35). Moreover, the ALJ included limitations and restrictions in plaintiff's RFC to "safeguard the

17

claimant from activities that might precipitate or aggravate her purported symptoms[.]" (Tr. 35; *see also* Tr. 24). Plaintiff's argument that the ALJ failed to consider this portion of Dr. Stevenson's opinion is overruled.

### e. The ALJ's RFC was supported by substantial evidence

Plaintiff argues that the ALJ's RFC is unsupported by substantial evidence because the ALJ failed to properly evaluate Dr. Stevenson's opinion. (Doc. 18 at PAGEID 2263). A claimant's RFC is an assessment of the most that a claimant "can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The Social Security regulations vest the ALJ with the responsibility of assessing an individual's RFC. *See* 20 C.F.R. § 404.1546(c) (the responsibility for assessing a claimant's RFC at the administrative hearing level lies with the ALJ). The ALJ is responsible for assessing a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3). This includes weighing the relevant medical opinions of record. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010).

As explained above, the ALJ's evaluation of Dr. Stevenson's opinion is supported by substantial evidence. To the extent plaintiff argues that the ALJ's RFC is unsupported by substantial evidence because the ALJ determined that plaintiff could remain on task 96% of the workday and "provided no explanation of how she achieved this number" (Doc. 18 at PAGEID 2266), plaintiff's argument is without merit.

Plaintiff contends that this percentage "is not repeated anywhere else in the medical records" and the ALJ "pulled the number '96' out of h[er] hat and determined that was a percentage Plaintiff was capable of remaining on task during the workday." (*Id.*). The Commissioner argues that plaintiff "fails to satisfy her burden of providing evidence that she would be off task for more than 4% of the day." (Doc. 19 at PAGEID 2278).

18

The ALJ's RFC, in pertinent part, states that plaintiff "is able to remain on task 96% of the work period." (Tr. 24). The ALJ states that the RFC "accommodates the claimant's chronic idiopathic urticaria, along with her subjective symptoms of fatigue and itching by limiting the claimant to the medium exertional level. In addition, as a precaution as it was still unclear why the claimant was getting hives and rashes, she should avoid concentrated exposure to dusts, gases, and poorly ventilated areas." (Tr. 30). The ALJ explains that "considering her itching, the claimant would be able to remain on task 96% of the work period." (*Id.*; *see also* Tr. 33: "she would be able to remain on task 96% of the work period"; Tr. 35: "her symptoms could be expected to render[] her off task with the ability to remain on task 96% of the work period considering claimant alleged that her hives were worse at night").

At the hearing, the VE testified that jobs would exist in the national economy that a hypothetical individual could perform if the individual was able to remain on task 92 percent of the workday. (Tr. 72). The VE testified that it would be work preclusive, however, if the hypothetical individual could remain on task only 88 percent of the workday. (*Id.*).

Although plaintiff alleges that the ALJ erred by concluding that plaintiff could remain on task 96% of the workday, it is plaintiff's burden to establish that her off-task percentage would be work preclusive, i.e., more than 12 percent of the workday. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("[D]uring the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five."). Plaintiff fails to point to any record evidence establishing that she would be off task *more than* the percentage the ALJ calculated in the RFC or testified to by the VE. *See Vanwormer v. Comm'r of Soc. Sec.*, No. 19-10836, 2020 WL 7021692, at *3 (E.D. Mich. Nov. 30, 2020) (finding plaintiff had "not met her burden of proof to establish that her off-task percentage would be higher than 10%").

19

*See also Rios v. Comm'r of Soc. Sec.*, No. 2:20-cv-12231, 2022 WL 326274, at *7 (E.D. Mich. Jan. 14, 2022), *report and recommendation adopted*, 2022 WL 317755 (E.D. Mich. Feb. 2, 2022) ("Plaintiff has not shown error in the ALJ's corollary conclusion that Plaintiff 'would not be off task more than 10% percent of the workday.'").

In sum, plaintiff has not shown that the ALJ erred by failing to fully account for her alleged impairments and resulting limitations in the RFC finding. Accordingly, the ALJ's RFC is supported by substantial evidence, and plaintiff's assignment of error regarding the ALJ's RFC assessment is overruled.

### III. Conclusion

Based on the foregoing, plaintiff's Statement of Errors (Doc. 18) is **OVERRULED**, and the Commissioner's non-disability finding is **AFFIRMED**. **IT IS THEREFORE ORDERED** that judgment be entered in favor of the Commissioner and this case is closed on the docket of the Court.

Date: 2/26/2022

Karen L. Litkovitz
Chief United States Magistrate Judge